RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0031p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

ROGER L. WHEELER,

          *Petitioner-Appellant,*

       *v.*

THOMAS L. SIMPSON, Warden,

          *Respondent-Appellee.*

No. 11-5707

Appeal from the United States District Court
for the Western District of Kentucky at Louisville
No. 3:09-cv-00336—Joseph H. McKinley, Jr., Chief District Judge.

Argued: October 1, 2014

Decided and Filed: February 20, 2015

Before: MERRITT, GRIFFIN, and WHITE, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Joseph T. Flood, SHELDON, FLOOD & HAYWOOD, PLC, Fairfax, Virginia, for Appellant. David W. Barr, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Joseph T. Flood, SHELDON, FLOOD & HAYWOOD, PLC, Fairfax, Virginia, David M. Barron, KENTUCKY DEPARTMENT OF PUBLIC ADVOCACY, Frankfort, Kentucky, for Appellant. David W. Barr, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

    MERRITT, J., delivered the opinion of the court in which WHITE, J., joined. GRIFFIN, J. (pp. 16–45), delivered a separate dissenting opinion.

1

_____

**OPINION**

_____

MERRITT, Circuit Judge.  This death penalty case from the Kentucky courts arises from the brutal murder of two victims in October of 1997.  For reasons explained below, we conclude that a writ of habeas corpus must be issued as to the death sentence because the Kentucky trial court erroneously struck from the jury a Mr. Kovatch, an eligible juror who may have been in favor of sparing the Petitioner's life.  The state trial court, after a full examination of Mr. Kovatch at voir dire, found him not to be "problematic" as a juror but one who "could consider the entire range" of penalties.  Then the next day the trial court excused him because the judge mistakenly remembered him saying he would not consider the death penalty.  The issue is one of procedural fairness in administering the death penalty.  As the Supreme Court has observed, to permit the for-cause exclusion of an otherwise-eligible juror "unnecessarily narrows the cross-section of venire members" required under the Sixth Amendment and "'stack[s] the deck against the petitioner.  To execute [such a] death sentence would deprive him of his life without due process of law.'"  *Gray v. Mississippi*, 481 U.S. 648, 658-59 (1987) (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 523 (1968)).

## I.    Factual and Procedural History

In 2001, a Kentucky state jury sentenced Roger Wheeler to death after convicting him of two counts of intentional murder.[1]  On direct appeal, the Supreme Court of Kentucky affirmed Wheeler's convictions and sentence, making the following findings of fact:

> On October 2, 1997, Louisville police discovered the bodies of [Nigel Malone and Nairobi Warfield] in the apartment the victims shared.  The male victim was found in a hallway near the bathroom.  He had suffered nine stab wounds.  Two stab wounds to the chest were considered the fatal wounds by the medical examiner.  She described the crime scene as having blood spatters on the floor, walls, furniture and appliances.  The medical examiner believed that the main

---

[1]The jury recommended a death sentence for each conviction after finding one aggravating circumstance: Wheeler's acts of killing were intentional and resulted in multiple deaths.  *See* Ky. Rev. Stat. Ann. § 532.025(2)(a)(6).

struggle occurred in the kitchen and progressed to the hallway where the body of the male victim was found.

The female victim died as a result of manual strangulation. The medical examiner testified that she believed the struggle between the female and her assailant occurred in the bedroom where she was found. The female victim had multiple abrasions on the left side of her neck and lacerations with a bruise on her mouth and several bruises on her lips. Her body was found in a seated position, leaning against a bedroom wall. She was covered with a blanket or quilt and a scissors was protruding from her neck. The medical testimony determined that she had been stabbed with the scissors after she was already dead. During the autopsy, the medical examiner discovered that the female victim was pregnant.

There was blood on the floors and walls in nearly every room in the apartment. Numerous blood samples were also collected at the scene and were subject to laboratory testing. No fingerprints were found on the scissors.

Wheeler denied killing the two victims but he changed his story on several occasions. Originally, he denied ever being inside of the apartment on the night the murders occurred but then later admitted being in the apartment on that night. He claimed that Nigel Malone was already stabbed, but that he did not see Nairobi Warfield. He also asserts that the assailant was already inside the apartment and he and that person fought which was why he was wounded.

*Wheeler v. Commonwealth*, 121 S.W.3d 173, 178 (Ky. 2003) (*Wheeler I*). The Kentucky state courts subsequently denied Wheeler's petition for post-conviction relief. *See Wheeler v. Commonwealth*, No. 2006-SC-000901-MR, 2008 WL 5051579, at *11 (Ky. Nov. 26, 2008) (*Wheeler II*).

Wheeler filed the instant petition for a writ of habeas corpus in May of 2009. Overruling Wheeler's timely objections, the district court adopted the magistrate judge's report and granted summary judgment to the State on all claims. We ultimately certified twelve claims for appellate review. Of these claims, six concern Wheeler's conviction; the rest deal with the jury's imposition of the death penalty.

## II.    The Exclusion of Mr. Kovatch

The Kentucky trial judge struck Juror Kovatch from the jury even though he expressly stated that he could consider the full range of punishment — including the death penalty — after earlier expressing reservations and uncertainty about its wisdom. In reviewing his exclusion, the Supreme Court of Kentucky neither provided any details about Mr. Kovatch nor referred to

Supreme Court case law on the subject. Instead, it simply stated that the trial judge "appropriately struck for cause those jurors that could not impose the death penalty." *Wheeler I*, 121 S.W.3d at 179.

The Kentucky trial judge conducted the initial voir dire of Mr. Kovatch before the lawyers examined him. She inquired whether he could consider the entire range of penalties, specifically asking about "[twenty] years imprisonment" and "the death penalty." Voir Dire Tr. at 1. He replied he "probably" could consider the death penalty "after some deep reflection." *Id.* Mr. Kovatch further said that he had not "formed an opinion one way or the other" regarding the death penalty and noted that there were "arguments on both sides of . . . it." *Id.* at 2. Furthermore, he did not believe he had "any moral, religious, spiritual or personal beliefs that would keep [him] from considering the death penalty." *Id.*

The prosecutor's voir dire questioning explained that if the jury found the defendant guilty of two homicides, "the Judge, at that point, would give [the jury] a penalty range of [twenty] years all the way up to the death penalty and all the options in between." *Id.* at 6. Mr. Kovatch replied that he had never "been confronted with that situation" before and it was "difficult for [him] to judge how [he] would . . . act." *Id.* The prosecutor then asked Mr. Kovatch if he was saying he was "not *absolutely certain* whether [he] could realistically consider [the death penalty]. . . ." *Id.* at 7 (emphasis added). Mr. Kovatch acknowledged he was not "absolutely certain" by saying, "I think, I think that would be the most accurate way I could answer your question." *Id.*

Soon after, upon examination by defense counsel, Mr. Kovatch described the death penalty as "a very philosophical topic" and "a very difficult one." *Id.* at 8. He discussed getting older, understanding "a lot more things about values and [] life itself." *Id.* He described himself as "a bit more contemplative on the issue of taking a life and . . . whether or not we have the right to take that life." *Id.* He was then asked whether he felt he could "consider all of the options presented." *Id.* at 9. He responded, "I believe I can, sir." *Id.*

After the trial judge excused the jurors for the evening, the prosecution moved to excuse Mr. Kovatch for cause, claiming he gave "two inconsistent answers" because "he could not say whether he could realistically consider the death penalty or not." *Id.* at 9. The prosecutor

suggested that the "gravamen of his testimony" provided grounds to strike him for cause under *Gall v. Parker*, 231 F.3d 265 (6th Cir. 2000), as "a juror who can't say if he can give the death penalty." Voir Dire Tr. at 9-10.

Responding to the prosecution's motion, defense counsel highlighted Mr. Kovatch's answers to the judge indicating his ability to consider "all the penalty options." Counsel said he was "a man who has contemplated this issue" who "wants to be . . . very honest and candid with the Court" despite having "some reservations about the death penalty." *Id.* The defense further argued (correctly) that nothing in the case law disqualifies a juror "because they . . . question some aspects of the death penalty or they consider it to be a serious matter, or they consider it to be something that . . . calls into question[] . . . issues of . . . life and how important it is." *Id.*

Responding immediately to the prosecutor's motion, the trial judge expressed her impression that Mr. Kovatch was "someone who would take this job very seriously and who had serious reservations about the death penalty." *Id.* at 12. She believed he was someone who "could consider the entire range" after her questioning and "didn't even see him as problematic when [she] got through with him." *Id.* The trial judge then took the motion under advisement.

The following morning, the trial judge struck Mr. Kovatch for cause, relying on an inaccurate paraphrase of the record suggesting that Mr. Kovatch "couldn't consider" the death penalty:

> [T]he Commonwealth moved to strike Mr. Kovatch because . . . of his expressed . . . concerns about considering the entire range. And when I went back and reviewed his entire testimony, [the prosecutor] concluded with saying, "Would it be accurate to say that *you couldn't, couldn't consider the entire range*?" And his response is — I think was, "I think that would be pretty accurate." So I'm going to sustain that one too.

*Id.* at 14 (emphasis added). This description differed materially from the prosecutor's actual question: "And if I understand you correctly, you're . . . telling me that, at this point *you're not absolutely certain whether you could realistically consider it or not*?" *Id.* at 7 (emphasis added).

Mr. Kovatch agreed *he did not know* to an absolute certainty whether he could realistically consider the death penalty, but the court proceeded as if *he knew he could not*. Mr. Kovatch clearly stated he could consider the full range of penalties prescribed by Kentucky law,

and before her subsequent mischaracterization of his answer, the trial judge observed that he could "consider the entire range" and should be viewed as a good juror who was not even "problematic."

Although Supreme Court precedent addressing the exclusion of venirepersons from death-penalty juries has evolved and been clarified, the Court has repeatedly held that a venireperson who has reservations about the death penalty cannot be excused for cause if he or she is able to follow the trial court's instructions and consider all penalties provided under the law. In *Witherspoon*, the first Supreme Court case in a line of cases addressing this issue, the Court held that the only venirepersons who may be excluded for cause are:

> [T]hose who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

391 U.S. at 522 n.21. In *Wainright v. Witt*, the Court clarified *Witherspoon* as follows:

> That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.

469 U.S. 412, 424 (1985) (footnote omitted).

In subsequent cases, the Court again clarified its position by holding that a juror may not be excluded if, like Mr. Kovatch, he can set aside his doubts and consider the death penalty. In *Lockhart v. McCree*, Justice Rehnquist explained:

> It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

476 U.S. 162, 176 (1986). And, in *Uttecht v. Brown*, the most recent Supreme Court decision to discuss the for-cause removal of death penalty sentencing-phase juror, the Court again reiterated

that "[c]apital defendants have the right to be sentenced by an impartial jury," and, to this end, reaffirmed that "[t]he State may not infringe [the *Witt* right] by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties." 551 U.S. 1, 9, 22 (2007).

Although *Uttecht* held that a trial judge's decision regarding for-cause removals should be afforded great deference, *id.* at 17–22, it also made clear that "[t]he need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decisions where the record discloses no basis for a finding of substantial impairment," *id.* at 20. In *Uttecht*, the deference owed to the trial judge was largely premised on the trial judge's ability to "observe the demeanor of [the juror during *voir dire*]," and the defense's decision not to object when, after *voir dire* had concluded, the State challenged the juror for cause. *Id.* at 17–19 ("The defense's volunteered comment that there was no objection is especially significant. . . ."). Moreover, it was clear from the record that the juror "had both serious misunderstandings about his responsibility as a juror and an attitude toward capital punishment that could have prevented him from returning a death sentence under the facts of this case." *Id.* at 13.

Here, Mr. Kovatch did not display a misunderstanding of his role as a potential juror or misstate the applicable law. He understood the decisions he would face and engaged with them in a thoughtful, honest, and conscientious manner. More important in the context of *Uttecht*, the trial judge's initial assessment of Mr. Kovatch's answers and demeanor reveals that she judged him as someone who "could consider the entire range" and "didn't even see him as problematic when [she] got through with him."[2] The trial judge reversed her initial assessment of Mr.

---

[2]In responding to the State's challenge, the trial judge said:

> Well, um, my overall sense was that he was, uh, someone who would take this job very seriously and who had serious reservations about the death penalty, but his responses to my questions were not at all indicative of someone – uh, in fact, what I do when I finish my, my questioning is, is, first of all, put down "could consider entire range" or "exhibits reluctance on death penalty" or "exhibits reluctance on 20 years" or "can't consider" – I do sort of a summary. Uh, and I put "could consider entire range." I mean, I didn't even see him as problematic when I got through with him. Um, I think if you look at the totality of the questioning, what he's indicating, uh, that I understood was that he would take it very seriously but that he could consider the entire range. Um, and I guess and, and maybe I just didn't hear it phrased the, the way that [the prosecution] phased it but, um, I didn't hear him say that he couldn't realistically consider the death penalty. Did he actually say that?

Kovatch's qualification, which was based on his demeanor and answers, after misapprehending a single question and answer exchange with the prosecutor. Had the trial judge properly processed that exchange, her initial belief that Mr. Kovatch was not "problematic" and "could consider the entire range" would have been confirmed. Thus, the deference owed to the trial judge's ability to assess Mr. Kovatch's demeanor supports that he was *Witt*-qualified to serve on Wheeler's jury.

Aware of the great deference owed a trial judge's decision to remove a potential juror for cause, we nevertheless find that the Kentucky court unreasonably applied clearly established Supreme Court law—namely, *Witt* and its progeny—when it held that Mr. Kovatch's removal for cause was constitutional.[3]

The Supreme Court has repeatedly made clear that the improper exclusion of a qualified juror in a death penalty case is presumed prejudicial. In *Gray*, it stated that it had "established a *per se* rule requiring the vacation of a death sentence imposed by a jury from which a potential juror, who has conscientious scruples against the death penalty but who nevertheless under *Witherspoon* is eligible to serve, has been erroneously excluded for cause." *Gray*, 481 U.S. at 659 (citing *Davis v. Georgia*, 429 U.S. 122, 123–24 (1976)). Thus, an improper for-cause exclusion of a prospective juror such as Mr. Kovatch is precisely the type of "structural error"[4] that the Supreme Court has said may not be excused through harmless-error analysis or on grounds of a lack of prejudice.

Since the *Lockhart* and *Gray* cases in 1986 and 1987, this has been the constitutional rule we must apply in all for-cause juror-exclusion cases. *See, e.g.*, *Uttecht*, 551 U.S. at 22 ("The State may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties."). The specificity and clarity of this rule also satisfies the AEDPA statutory requirement that a writ of habeas corpus may not be issued against a state-court judgment unless the state decision "was contrary

---

R. 74, PID 892–93.

[3]We also observe that the trial judge's misapprehension of Mr. Kovatch's exchange with the prosecutor may itself warrant relief under 28 U.S.C. § 2254(d)(2) because it led to a "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." We need not reach that question.

[4]For a discussion of the "structural error" cases, including the *Gray* case, see 3B Charles Alan Wright et al., *Federal Practice and Procedure* § 855 (4th ed. 2014).

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[5]

Because we find that the trial court unconstitutionally excluded Mr. Kovatch from the jury warranting a new penalty-phase trial for Wheeler, we need not decide and therefore pretermit any other sentencing issues raised in his habeas petition. We will now turn to the issues raised by Wheeler concerning the guilt phase of his trial. We do not find that any of them warrant habeas relief.

### III.    Evidence of Victim's Pregnancy

Wheeler contends that the trial court denied him a fundamentally fair trial by admitting "irrelevant" evidence that the female victim, Nairobi Warfield, was pregnant at the time of her death. In the state appellate courts, Wheeler framed this issue primarily as a violation of Kentucky state law[6] as well as the Fourteenth Amendment of the United States Constitution. In this habeas appeal, he asserts that the allegedly improper admission of the evidence was so prejudicial as to render his entire trial fundamentally unfair.

There were only two references to Warfield's pregnancy at trial.[7] The Supreme Court of Kentucky held that this evidence was admissible and not prejudicial under Kentucky law, particularly in light of the "brief" role it played. *Wheeler I*, 121 S.W.3d at 181. Thus, this claim is not cognizable on federal habeas corpus review — at least to the extent that Wheeler claims its admission contravened Kentucky's laws or its rules of evidence. *See, e.g.*, *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) ("[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus.").

---

[5]AEDPA deference prevents federal habeas courts from upsetting many state court determinations. Under AEDPA, we may not grant a writ of habeas corpus unless the state court's adjudication of the claim was contrary to or an unreasonable application of federal law or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d). An unreasonable application of clearly established federal law occurs where a state court accurately identifies the governing legal rule but applies it in an unreasonable manner to the facts of the case before it. *Moore v. Berghuis*, 700 F.3d 882, 886 (6th Cir. 2012).

[6]Wheeler argued that the admission of this evidence violated Kentucky Rule of Evidence 404(b) as well as Sections 2 and 11 of the Kentucky Constitution — which provide for a right to a fair trial.

[7]The medical examiner testified the autopsy revealed that Warfield was pregnant with a small embryo, and the prosecution also briefly mentioned the pregnancy during its closing argument. (R. 52, PID # 57).

Wheeler cites no Supreme Court decisions in which several brief references to the pregnancy of the murder victim, without more, have been held sufficiently egregious so as to violate the due process clause.[8] It stands to reason that a state court cannot rule contrary to established precedent when no such precedent exists. In short, Wheeler has failed to persuade us that the admission of evidence related to Warfield's pregnancy rendered his trial fundamentally unfair. Accordingly, no habeas relief is appropriate on this claim.

## IV.    Ineffective-Assistance-of-Counsel Claims

To demonstrate ineffective assistance of counsel, Wheeler must demonstrate that his trial "counsel's performance was deficient, and that the deficiency prejudiced his defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Moreover, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

Wheeler raises three guilt-phase ineffective-assistance-of-counsel claims. We address each in turn.

### A.    *Failure to Conduct an Adequate Investigation of Wheeler's Shoes*

Police found several bloody shoe prints at the crime scene. In the middle of trial, Wheeler informed his trial counsel that he still possessed the gray Nike tennis shoes he claimed to have worn when he entered the victims' apartment on the night of the murders. Wheeler's trial counsel thus attempted to introduce these shoes for the jury to compare with the bloody shoeprints. The trial court, however, sustained the prosecution's objection and excluded the shoes on grounds of inadequate notice and lack of a chain of custody. The Supreme Court of Kentucky held that their exclusion was proper for a different reason: the shoes were irrelevant because Wheeler never testified that he was wearing them while he was inside the victims' apartment on the night of the murders. Rather, Wheeler testified on avowal only that he was wearing them the next day when he was arrested. Nor did the defense offer any other evidence

---

[8]Wheeler's brief relies heavily on the Fifth Circuit's opinion in *White v. Thaler*, 610 F.3d 890 (5th Cir. 2010). This case does not entitle him to habeas relief. Even if we were to conclude that the Supreme Court of Kentucky's decision in this case was "contrary to" *White*, that case is not Supreme Court precedent as required by 28 U.S.C. § 2254(d)(1).

to link the shoes to the crime scene. Thus, "[t]he mere fact that Wheeler owned a pair of shoes that may or may not have matched the shoe prints found at the crime scene did not tend to make the defense theory more probable." *Wheeler I*, 121 S.W.3d at 182.

In this habeas appeal, Wheeler argues that his trial counsel was ineffective for: (1) failing to elicit testimony that his shoe size was larger than the prints found by police; (2) failing to lay a proper foundation for introducing the tennis shoes he claims he was wearing the night of the murders; and (3) failing to retain a shoeprint expert.

As an initial matter, Wheeler's claim that his trial counsel should have elicited testimony from him about his shoe size is procedurally defaulted. Wheeler did not present this claim to the state courts, and no state remedy now exists for doing so. *See Lovins v. Parker*, 712 F.3d 283, 293 (6th Cir. 2013). Nor does Wheeler attempt to show cause and prejudice to cure the default. Accordingly, no relief is warranted.

Wheeler also faults his trial counsel for failing to elicit testimony as to whether he wore his tennis shoes on the night of the murders. The thrust of this argument is that admission of the tennis shoes would have corroborated Wheeler's testimony and thus enhanced his credibility — *i.e.*, someone else must have committed the murders if the bloody footprints were not his. This line of reasoning omits a critical point: Wheeler cannot demonstrate prejudice without knowing the victims' shoe sizes. The bloody footprint may have belonged to one of them.

As for his claim regarding his trial counsel's failure to call a shoe expert, Wheeler asserted in his state post-conviction proceedings that had his tennis shoes been admitted into evidence, an expert would have been unnecessary for "jurors to compare the shoes with the shoe prints at the scene. A layperson could determine this fact." *Wheeler II*, 2008 WL 5051579, at *6. The Supreme Court of Kentucky considered this admission "tantamount to a concession that lack of an expert was not ineffective assistance." *Id.* We agree. In light of these facts and the strength of the murder evidence, we cannot say that the Supreme Court of Kentucky unreasonably applied *Strickland* by holding that Wheeler was not prejudiced by the lack of a shoe expert.

### B.        Other Ineffective-Assistance-of-Counsel Claims

Wheeler claims that his trial counsel was constitutionally ineffective for failing to explain the presence of his blood on the female victim's thigh.  He further argues that his trial counsel was ineffective for not sufficiently investigating or challenging the adequacy of the police techniques used to gather the blood evidence at the crime scene.  The answer to these arguments is that there was simply no evidence his lawyer could use to rebut this evidence of guilt.  Wheeler's brief cites neither any authority nor any portion of the record in support of this claim.  Hence, this claim must be rejected.

Wheeler further contends that his trial counsel was ineffective for failing to call Earl Ricketts, Jr., to contradict the testimony of Denise Mumpfort.  Mumpfort worked at a convenience store near the apartment where the murders occurred and testified that Wheeler had entered the store that night looking like someone had "poured [blood] on his head." Wheeler claims that Ricketts, a security guard at the store, would have testified that Wheeler only had some blood on him "but not a lot."  This proposed testimony would not have contradicted Mumpfort's in any material way.  The mere presence of blood is all that mattered given Wheeler's testimony that he had been injured while fighting the alleged assailant who was armed with a knife.  Trial counsel's decision not to call Ricketts was thus a question of tactics, and was not a significant mistake, if a mistake at all.

### V.        Prosecutorial Misconduct

Wheeler's first claim of misconduct involves the prosecutor's references to the shoeprint argument as a "defense trick" designed to distract the jury from more critical evidence.[9]  The Kentucky trial court held that these statements were fair commentary on the defense's theory of the case — *i.e.*, Wheeler's reliance upon supposed inconsistencies with various shoeprints.  The Kentucky Supreme Court held that the prosecutor's comments did not deprive Wheeler of a fundamentally fair trial.  *Wheeler I*, 121 S.W.3d at 189.  Although the word "trick" can be viewed as unnecessarily pejorative, the comment was both isolated and responsive, and the

---

[9]The prosecutor said:  "So [the defense] gets up and said, 'Well, the shoeprint, that's the most telling of all.'  Forget about all that DNA, forget about all the lies.  It's called the defense trick.  Look away, look away, look away.  Don't look at the facts."  PID 2053.

Kentucky Supreme Court reasonably concluded that the comment did not have an effect on Wheeler's due process right to a fair trial.

Wheeler also condemns the prosecutor's comments in closing concerning the unavailability of Wheeler's tennis shoes — evidence the prosecution itself had successfully convinced the trial court to exclude. Specifically, the prosecutor stated, "We need a shoe to compare [the bloody shoeprint] to. We don't have that. If you remember, [Wheeler] says, 'I had . . . gray Nike tennis shoes, denim pants and a black or dark sweatshirt on.' He knows where his clothes are at. Mr. Cooperative never brought them in."[10] Wheeler argues that this statement amounts to an improper attempt to shift the burden of proof onto him — *i.e.*, he needed to produce his tennis shoes in order to establish his innocence. The Kentucky trial court held that by previously mentioning the shoeprint evidence, Wheeler's trial counsel opened the door for the prosecution to discuss that topic. The Kentucky Supreme Court held that the argument did not render Wheeler's trial fundamentally unfair. *Wheeler I*, 121 S.W.3d at 189. This conclusion did not involve an unreasonable application of federal law.

Wheeler's final misconduct argument concerns the prosecutor's statements regarding Shannon Calloway, a witness who discovered the victims' bodies and later accused Wheeler of being the perpetrator. Unbeknownst to the jury, Calloway died before trial in an unrelated

---

[10]During closing argument, Wheeler's counsel focused on the shoeprint evidence several times, arguing: "Now when you go back to deliberate, I'm going to ask you to look very, very closely at the shoeprint evidence. . . . Please look very, very closely when you get back there. This shoeprint [lifted from the crime scene] and these shoeprints [lifted from a different area of the crime scene] don't match. There were obviously at least two other people in that home." PID 2014–42. Later, she suggested that a witness who was not called left the shoeprints: "Maybe they should have checked Shannon Calloway's shoe size. Maybe they should have compared Shannon Calloway's shoes to what they've got here." PID 2046. Again, "There had to be more than one person [in the home]. The shoeprint evidence tells you that." PID 2047. All of this appears to be support for the defense's ultimate conclusion that: *"Now if these shoeprints would have fit those of Roger Wheeler's, you would have heard that evidence. Those aren't Roger Wheeler's shoeprints."* PID 2048.

Aware that the defense's closing argument revolved around the shoeprint evidence (or lack thereof), the prosecutor responded: "ETU [the state's evidentiary unit] does a good, thorough job [lifting the shoeprints]. . . . But you know what? We need a shoe to compare it to. We don't have that. If you remember, [Wheeler] says, 'I had gray Nike Airs or gray Nike tennis shoes, denim pants, and a black or dark sweatshirt on.' He knows where his clothes are at. Mr. Cooperative never brought [the shoes] in." PID 2051–52.

The trial judge overruled the defense's objection to this statement. Out of the presence of the jury, the trial judge first commented that the defense had tried to introduce the shoes only after trial had started (and thus the evidence was untimely). The trial judge then stated: "I do think it's fair for [the prosecutor] to comment on the fact that [the defense] focused greatly on the shoeprint [evidence]. . . where that could have been pursued and it wasn't." PID 5052–53.

Regarding use of "Mr. Cooperative," the prosecutor made clear that "[the defense attorneys] keep hammering on how cooperative [Wheeler] was [when approached by police prior to being arrested], and that's why I'm making the statement if he was so cooperative, then why didn't he bring [the shoes] in, too?" PID 2053. The trial judge responded that she understood the prosecutor's reasoning and did not suggest it was improper.

incident.  In final arguments, however, the defense suggested that Calloway may have been the real murderer but never explained that he was dead.  In response, the prosecutor's closing argument stated that it was "kind of difficult in the middle of trial to stand up and run out and find people that the Defense wants us to get up and start pointing fingers at."  Wheeler contends that this argument was improper for suggesting that he had some duty to call Calloway or had something to hide by failing to call Calloway as a witness.  Again, the Kentucky Supreme Court determined that the argument did not deprive Wheeler of a fundamentally fair trial, and this determination, too, was not unreasonable.  It is clear from the record that the prosecutor's comments were made in response to Wheeler's trial counsel's intimations that Calloway was the real murderer.

## VI.     Requested Jury Instructions

Finally, Wheeler argues that the trial court's failure to instruct the jury on voluntary intoxication and extreme-emotional disturbance denied him a fundamentally fair trial and thus was contrary to, or an unreasonable application of, the Supreme Court's holding in *Beck v. Alabama*, 447 U.S. 625 (1980).

In capital cases, *Beck* requires a jury be instructed on non-capital lesser-included offenses only if "the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater."  *Id.* at 635.  Moreover, "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction."  *Hopper v. Evans*, 456 U.S. 605, 611 (1982).  Thus, we must consider the facts of the case and the criminal laws of the state to determine whether the requested instruction on a lesser-included offense is warranted.  *See Smith v. Bradshaw*, 591 F.3d 517, 523-25 (6th Cir. 2010).

To receive extreme-emotional-disturbance instructions under Kentucky law, a defendant must put forth evidence of a dramatic "triggering event" that created "temporary emotional disturbance that overwhelm[ed] the defendant's judgment."  *Baze v. Parker*, 371 F.3d 310, 325 (6th Cir. 2004) (citations omitted).  Wheeler, however, has made no such showing.  Neither his testimony nor any circumstantial evidence suggested any possible triggering event that would cause a mindless explosion of brutal violence.  The Supreme Court of Kentucky thus reasonably found that Wheeler was not entitled to an extreme-emotional-disturbance instruction.

The same is true concerning the voluntary-intoxication instruction. Under Kentucky law, this instruction is warranted only where the evidence sufficiently indicates a voluntary intoxication so severe that the defendant not only could not form the intent to kill, but also did not know what he or she was doing at the time. *Harris v. Commonwealth*, 313 S.W.3d 40, 50-51 (Ky. 2010) (citation omitted). Although Wheeler had undoubtedly been drinking and smoking crack cocaine the night of the murders, the record presents no evidence suggesting that he was so intoxicated that he could not conform his conduct to the law. Indeed, Wheeler's testimony as to his actions later that evening confirmed that he was well aware of events around him and acting of his own volition. Again, the Supreme Court of Kentucky reasonably reached this exact conclusion in accordance with the *Beck* standard.

## VII. Conclusion

For the foregoing reasons, we hold that Wheeler is entitled to habeas relief as to his death sentence only. The judgment of the District Court is affirmed as to the guilt phase of the state trial. Contrary to our dissenting colleague's view, however, AEDPA does not protect an inconsistent ruling by the state trial judge based on a mistaken memory of a juror's earlier voir dire testimony. The judgment, therefore, is reversed as to the death sentence, and the case is remanded with instructions to issue the writ of habeas corpus.

_____

**DISSENT**

_____

GRIFFIN, Circuit Judge, dissenting.  Petitioner Roger Wheeler, a Kentucky death row inmate, appeals a federal district court order denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The district court granted a certificate of appealability (COA) on ten claims, and we certified two additional claims.  Unlike the majority, I conclude that petitioner is not entitled to habeas relief on any of his claims.  Thus, I respectfully dissent.

I.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits federal habeas review of state court proceedings and provides that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court adjudication is "contrary to" Supreme Court precedent under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." *Williams v. Taylor,* 529 U.S. 362, 405 (2000).  Under the "unreasonable application" clause of § 2254(d)(1), habeas relief is available if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case[.]" *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008) (citations and internal quotation marks omitted).  "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or

erroneous," but rather "must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (citations omitted). That means

> even clear error will not suffice. Rather, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was *so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (emphasis added, citations, quotation marks, and alterations omitted). In short, the standard for obtaining federal habeas relief is "difficult to meet." *Id.* (citation omitted).

In the present case, the Kentucky state trial court dismissed for cause a potential juror because he equivocated in his responses at voir dire, claiming to be able to apply the death penalty, while at the same time expressing reservations about his ability to do so. The state trial court ultimately found that Mr. Kovatch was impermissibly biased because he "expressed . . . concerns about considering" the death penalty as a sentencing option and dismissed him for cause. Because the state trial court's decision was neither an unreasonable determination of the facts nor an "error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *White*, 134 S. Ct. at 1702, petitioner is not entitled to habeas relief on this issue.

## II.

### A.

First, petitioner Wheeler argues that the trial court's decision to dismiss Mr. Kovatch was based on an unreasonable determination of the facts, thus violating § 2254(d)(2). A trial court's finding regarding a juror's bias is a finding of fact. *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003) (citing *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). In addition to § 2254(d)(2), § 2254(e)(1) applies to our review of a state court's factual determinations. Taken together, these provisions embody the principle that, on habeas review, federal courts must afford substantial deference to the factual findings of a state court.

The Supreme Court has explained:

> AEDPA instructs that, when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." § 2254(e)(1). We have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here. *See Wood v. Allen*, 558 U.S. 290, 293 (2010). For present purposes, it is enough to reiterate "that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Id.*, at 301.

*Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

Petitioner argues that deference to the state trial court's findings of fact is not warranted because the court misread the voir dire testimony related to Mr. Kovatch. In other words, petitioner argues that the transcript itself is conclusive proof that the state trial court's conclusion about Mr. Kovatch's bias was an unreasonable determination of the facts. I disagree.

When questioned by the trial court about whether he could consider the death penalty, Mr. Kovatch replied, "[p]robably with some deep reflection." When the state judge asked him about his beliefs about the death penalty, Mr. Kovatch replied that he believed there were "arguments on both sides" of the issue and that he had not "formed an opinion one way or the other." The court then asked Mr. Kovatch whether he was a member of any religious or spiritual group that had an opinion concerning the death penalty; he responded that "[i]t is a topic of discussion" within that context. The prosecutor asked Mr. Kovatch if his position was that he was not "absolutely certain whether [he] could realistically consider" the death penalty, and Mr. Kovatch replied "that would be the most accurate way" to describe his position on the death penalty. Later, during questioning by defense counsel, Mr. Kovatch expressed his views on the death penalty as follows:

> [It is] a very philosophical topic. I think a very difficult one. Um, the older I get, uh, perhaps the more I understand, uh, a lot more things about values and . . . life itself. I have four children, and those things are important to me. So, uh, perhaps I'm a bit more contemplative on the issue of taking a life and, uh, whether or not we have the right to take that life.

However, Mr. Kovatch later indicated that he would be able to consider "all of the [sentencing] options presented."

The prosecutor moved to strike Mr. Kovatch for cause, arguing that he had given inconsistent answers regarding his ability to consider the death penalty. Defense counsel opposed the motion, arguing that "in the totality of his answers, clearly we've got an individual who has some reservations about the death penalty" but still argued that Mr. Kovatch could consider the death penalty as an option. The state trial judge ultimately agreed with the prosecutor that Mr. Kovatch was impermissibly biased and dismissed him for cause.

Based on this record, petitioner has not met his burden to overcome the presumption of correctness afforded to the state trial court's fact-finding. The record regarding Mr. Kovatch is substantially similar to that in *Jackson v. Houk*, 687 F.3d 723, 739–40 (6th Cir. 2012), *cert. denied,* 133 S. Ct. 1243. In *Jackson*, this court did not disregard the AEDPA deference afforded to the state court's factual findings, even though the record showed that a prospective juror was "equivocal in her responses" to questions about whether she could apply the death penalty. *Id*. at 739. Just as Mr. Kovatch in this case opined that he was "not . . . certain" that he could apply the death penalty, and that he was "contemplative" as to whether "we have the right to take [a] life[,]" Juror 301 in *Jackson* indicated she "didn't know" whether she could apply the death penalty. *Id*. at 740 (alteration omitted). Just as Mr. Kovatch here opined that he could consider all the sentencing options presented, Juror 301 in *Jackson* indicated unambiguously that she would "fairly consider" the death penalty, despite her reservations, and "would try" to apply it. *Id*. Thus, in *Jackson*, as here, a juror expressed doubts about the wisdom of the death penalty yet also equivocated, claiming to be able to apply it fairly. In both cases, the juror was struck for cause. *Jackson* relied on the deference owed to the state trial court in affirming. *Id*. Under the principles of deference embodied by §§ 2254(d)(2) and (e)(1), this case warrants the same result.

This result makes sense, moreover, given the nature of the burdens imposed by AEDPA. Again, under §§ 2254(d)(2) and (e)(1), this court must defer to the state trial court's finding that Mr. Kovatch was biased. *See Burt*, 134 S. Ct. at 15. And, again, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood,* 558 U.S. at 301. In other words, if reasonable

minds could differ about the correctness of the state trial court's fact-finding, its factual determinations are not unreasonable under § 2254(d)(2). Here, reasonable minds could readily differ because Mr. Kovatch equivocated in his answers about his ability to apply the death penalty.

Petitioner also claims he is entitled to relief under § 2254(d)(2) for a reason left unaddressed by the majority: that because a video record of the trial exists in this case, deference to the trial court is improper, and we may review de novo the facts surrounding Mr. Kovatch's selection. This novel argument is meritless. First, petitioner cites no authority for the proposition that AEDPA deference is not warranted where there is a video record of trial, and it is well-settled that "conclusory argument[s]" made "without any further discussion or citation to authority . . . [are] waived on appeal." *Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 441 (6th Cir. 2002) (citation omitted). Second, and critically, petitioner's argument is essentially an argument that we ignore the express will of Congress, which twice in AEDPA explicitly codified the deference owed to trial courts' findings of fact. *See* 28 U.S.C. §§ 2254(d)(2), (e)(1). The Supreme Court has recognized as much, explaining that AEDPA "provide[s] . . . binding[] directions to accord deference." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007). Neither the Supreme Court nor Congress has provided an exception to AEDPA's factual deference for cases in which a video record of the trial exists.

For these reasons, I would deny petitioner's claim that he is entitled to habeas relief under § 2254(d)(2).

B.

Next, petitioner Wheeler claims that he is entitled to habeas relief under § 2254(d)(1) because Mr. Kovatch's dismissal was "contrary to, or involved an unreasonable application of, clearly established federal law." Unlike the majority opinion, I conclude that petitioner is not entitled to habeas relief on this claim.

For-cause dismissals in death penalty cases are governed principally by *Wainwright v. Witt*, 469 U.S. 412 (1985). *Witt* held that the standard for such dismissals is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath." *Id.* at 424 (citation and quotation marks omitted). The juror's impartiality need not be demonstrated with "unmistakable clarity" as "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Witt*, 469 U.S. at 424. Accordingly, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law," despite a "lack of clarity" to this effect in the record. *Id.* at 425–26.

For precisely this reason, the Supreme Court held in *Uttecht*—the most recent case to address the issue of prospective juror dismissals—that deference to the trial court's determinations is required on habeas review in such cases. The Court explained that "[c]ourts reviewing claims of *Witherspoon–Witt* error . . . especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht*, 551 U.S. at 22. Indeed, the trial court not only has an opportunity to "assess the demeanor of the venire and the individuals who compose it," which is of "critical importance in assessing the attitude and qualifications of potential jurors," it is also uniquely situated to assess "nonverbal communication" occurring in the courtroom, *Id.* at 9–10, and to make credibility determinations that appellate courts cannot. *See United States v. Gabrion*, 719 F.3d 511, 527 (6th Cir. 2013) (en banc), *cert. denied*, 134 S. Ct. 1934 (2014).

Thus, "the question [for a federal court on habeas review] *is not whether [the] reviewing court might disagree with the trial court's findings, but whether those findings are supported by the record.*" *Witt*, 469 U.S. at 434 (emphasis added). Because of the deference to which a trial court's finding is entitled, when there is "ambiguity" in the record as to a juror's response to voir dire questioning, "the trial court . . . [is] entitled to resolve [that ambiguity] in favor of the State." *Id.*; *see also Uttecht*, 551 U.S. at 7.

The majority opinion ignores these principles by asking not whether there is evidence in the record to support the trial judge's finding of substantial impairment[1]—which is what AEDPA

---

[1]Petitioner asserts that the trial court did not apply *Witt*'s substantial impairment standard when dismissing Mr. Kovatch, and at oral argument noted that Kentucky's standard for juror dismissal does not track precisely with *Witt*. This is not a basis for relief. Ultimately, the trial court dismissed Mr. Kovatch because he equivocated in his

requires—but instead whether, in its judgment, the court "properly processed [the] exchange" between Mr. Kovatch and the prosecutor. The proper inquiry is whether the state court's finding of substantial impairment is supported by the record, irrespective of whether we would reach a different result. *Witt*, 469 U.S. at 434.

Here, there is support in the record for the trial court's ruling. As previously detailed, Mr. Kovatch gave equivocal answers to questions about whether he could apply the death penalty. Contrary to the majority opinion's summary of the transcript, the evidence for Mr. Kovatch's equivocation is not derived from a "single question and answer exchange with the prosecutor." Quite the opposite: Mr. Kovatch agreed he was not "absolutely certain" whether he could apply the death penalty in response to a question from the prosecutor. But, during an interchange with petitioner's trial counsel, Mr. Kovatch expressed doubts about "whether or not we have the right to take [a] life." Even petitioner's trial counsel acknowledged that Mr. Kovatch had equivocated in his responses when counsel opposed the prosecution's motion to have Mr. Kovatch struck for cause. In light of the fact that the trial court was entitled to resolve Mr. Kovatch's equivocation in favor of dismissal for cause, *see id.*, the grant of the petition for habeas corpus cannot be reconciled with AEDPA's requirement that a petitioner establish that the trial court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White*, 134 S. Ct. at 1702.

The majority opinion also relies on *Gray v. Mississippi*, 481 U.S. 648 (1986), for the proposition that the erroneous dismissal of a prospective juror in a death penalty case is a structural error not subject to harmless error review. Because I conclude that Mr. Kovatch's dismissal was not erroneous, I would not reach this issue. However, because the majority raises the issue, I briefly note my disagreement with its analysis.

The majority opinion's reliance on *Gray* is misplaced in light of *Uttecht*, which resolves the issue for the present case. The Supreme Court noted in *Uttecht* that *Gray* "represents a rare

---

answers regarding whether he could fairly apply the death penalty; this bias finding is a finding of substantial impairment under *Witt*, even if the trial court did not precisely quote *Witt*'s language. *See Witt*, 469 U.S. at 425–26 (noting that there will be situations where a trial court is left with a definite impression that a juror is biased, despite a "lack of clarity" to that end in the record, and deference is appropriate in those situations).

case" because "in the typical situation there will be a state-court finding of substantial impairment; in *Gray*, the state courts had found the opposite." *Uttecht*, 551 U.S. at 9. Thus, *Uttecht* held, *Gray* "is of limited significance to the instant case" and others in which there has been a state-court finding of substantial impairment requiring deference under AEDPA. *Id*.

In *Gray*, the trial judge realized during the course of voir dire that he had mistakenly overruled a number of the prosecutor's challenges for cause for prospective jurors who were excludable under *Witherspoon*, the prevailing standard at the time. *Gray*, 481 U.S. at 651–66. The fact that the trial judge erred in failing to dismiss the excludable jurors for cause forced the prosecution to use all of its peremptory challenges. Consequently, the prosecution asked for a dismissal of an additional prospective juror who had said she could "reach either a guilty or not guilty verdict and that she could impose the death penalty if the verdict were guilty." *Id*. at 654. The trial judge made no finding that the prospective juror was excludable and dismissed her as "a sort of 'make-up' for the challenges for cause the trial judge wrongfully denied." David McCord, *Is Death "Different" for Purposes of Harmless Error Analysis? Should It Be?: An Assessment of United States and Louisiana Supreme Court Case Law*, 59 La. L. Rev. 1105, 1138 (1999). No such circumstance exists here. Here, the trial judge found that Mr. Kovatch was impermissibly biased because he "expressed . . . concerns about considering" the death penalty as a sentencing option. Thus, as in *Uttecht*, *Gray* is of "limited significance"[2] in this case because, unlike in *Gray*, the trial court found Mr. Kovatch was substantially impaired. Under

---

[2]The majority opinion also paints an incomplete picture of the Supreme Court's harmless error doctrine in this context by failing to mention *Ross v. Oklahoma*, 487 U.S. 81 (1988). *Ross*, decided only a year after *Gray*, cast doubt on *Gray*'s sweeping rationale. The *Ross* court noted that

> the statement that any error which affects the composition of the jury must result in reversal defies literal application. If, after realizing its error, the trial court in *Gray* had dismissed the entire venire and started anew, the composition of the jury would undoubtedly have been affected by the original error. But the *Gray* majority concedes that the trial court could have followed that course without risking reversal.

*Id.* at 87 n.2. Indeed, there is reason to believe that

> the *Ross* Court largely overruled [*Gray*] by shifting the focus from the possible effect on the composition of the jury panel as a whole to the very narrow-and-unlikely-to-arise-right of the defendant to not have a death-qualified juror disqualified when it is clear that juror would have been impaneled because the prosecution was fresh out of peremptory challenges.

*McCord*, 59 La. L. Rev. at 1138. The ultimate issue is "whether the constitutional focus should be, as in *Gray*, on the composition of the jury panel as a whole, or as in *Ross*, on whether the jurors who were impaneled were qualified to sit." *Id*. And, because a qualified juror's exclusion from the venire tells us nothing about the qualifications of the jurors ultimately impaneled, "it seems hard to say that a defendant's death sentence is faulty when it was rendered by properly qualified jurors." *Id*. In any event, as noted above, *Uttecht* resolves the issue in this case.

AEDPA, this court is required to defer to the state court's ruling unless it violated §§ 2254(d)(1) or (d)(2). And, for the reasons I outline above, it did not.

III.

Next, Wheeler appeals the trial court's admission of evidence that Warfield was pregnant at the time she was killed. On direct appeal in the state appellate courts, petitioner framed this issue primarily as a violation of Kentucky state law—petitioner argued that the admission of this evidence violated Kentucky Rule of Evidence 404(b); Sections 2 and 11 of the Kentucky Constitution, which provide for a right to a fair trial; and the Fourteenth Amendment of the Federal Constitution. The Kentucky Supreme Court concluded that the admission of the evidence was proper under Kentucky law and that "[t]he pregnancy of the female victim was not sensational or shocking or prejudicial or likely to induce any undue sympathy. The brief reference to her pregnancy was fair comment to explain her identity. It did not deprive [petitioner] of a fair trial." *Wheeler v. Commonwealth*, 121 S.W.3d 173, 181 (Ky. 2003) (citation omitted).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67–68. Thus, "errors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citation and quotation marks omitted). Thus, to the extent that petitioner claims that the admission of evidence related to Warfield's pregnancy contravened Kentucky's laws or it rules of evidence, those claims are not cognizable on federal habeas corpus review.

However, where, as here, a habeas petitioner argues that the allegedly improper admission of evidence "was so prejudicial that its admission . . . rendered his entire trial fundamentally unfair" under the Federal Constitution, we may address the claim as a federal due process claim where the state court's "prejudice inquiry . . . bears at least 'some similarity' to a determination" of the due process claim he raises in his habeas petition. *Id*. at 519–20 (quoting *Maldonado v. Wilson*, 416 F.3d 470, 474 (6th Cir. 2005)). Here, petitioner's due process claim

bears "some similarity" to the state-law claim decided by the Kentucky Supreme Court. *Compare* Petitioner's Br. at 38–50, *with Wheeler*, 121 S.W.3d at 181. Accordingly, as in *Bey*, I review this claim under a "modified AEDPA standard, which requires us to conduct a careful review of the record and applicable law, but nonetheless bars us from reversing unless the state court's decision is contrary to or an unreasonable application of federal law, i.e., Supreme Court precedent." *Bey*, 500 F.3d at 520 (citation, quotation marks, and alterations omitted). And, because the Kentucky Supreme Court's "prejudice inquiry relied entirely on [Kentucky] law without any reference to federal law," this court "need not consider whether that decision resulted in *an unreasonable application of* federal law." *Bey*, 500 F.3d at 520. Rather, "[w]e need only look to the question of whether the [Kentucky] Supreme Court's decision is *contrary to* federal law." *Id.*

With this framework in mind, I turn to the evidence of Warfield's pregnancy. During pre-trial proceedings, petitioner's trial counsel moved to exclude evidence of Warfield's pregnancy as irrelevant under Kentucky Evidence Rule 401. In opposition, the prosecutor argued that the evidence should be admitted because it humanized the victim. Relying upon *Sanborn v. Commonwealth*, 754 S.W.2d 534, 542 (Ky. 1988), and *McQueen v. Commonwealth*, 669 S.W.2d 519 (Ky. 1984), the trial court overruled petitioner's trial counsel's motion, but instructed the parties that the evidence should not be "unduly emphasized" or used as a basis for argument. Petitioner's trial counsel asked the court to reconsider its ruling out of concern that a juror may have an emotional response to the evidence and subsequently consider the crime a triple homicide rather than a double homicide. The trial court re-affirmed its ruling.

At trial, during the prosecution's case-in-chief, the first reference to Warfield's pregnancy occurred during testimony by an assistant medical examiner for the Commonwealth of Kentucky, Amy Burrows, M.D., who performed the autopsy. Dr. Burrows testified that she discovered Warfield's pregnancy during the autopsy when she saw a "small embryo in an – in a little sac with a placenta." The trial court overruled petitioner's trial counsel's objection to that testimony.

A second reference to Warfield's pregnancy occurred at the close of the evidence for the guilt phase.  In its closing argument, the prosecutor referred to Warfield's pregnancy in an effort to humanize her to the jury:

> And what about Nairobi?  They didn't find drugs in her system.  Nobody has ever said she was a drug dealer.  What about her?  What about her life?  Autopsy told you (inaudible) she didn't have any alcohol in there.  There's no drugs.  She was pregnant.  I mean, she's a normal person.  She just loved a guy named Nigel.  He loved her.  They lived together in the west end, and they die[d] because of that.  And we're supposed to believe that's okay.

Petitioner's trial counsel did not object.

Initially, petitioner argues that the above evidence was irrelevant because "[n]either Warfield nor [petitioner] knew Warfield was pregnant" and submits case law from state courts in Florida, Texas, Indiana, and Kansas in support of the proposition that where, as here, a victim is not visibly pregnant, evidence of her pregnancy is not relevant in a homicide case.  However, the Kentucky Supreme Court, interpreting Kentucky law, has already held in this case that the evidence was admissible and not prejudicial, particularly in light of the "brief" role it played in the trial.  *See Wheeler*, 121 S.W.3d at 181.  And, in any event, these state-law decisions from other states do not establish that the Kentucky Supreme Court's decision in this case was contrary to clearly established *federal* law.

Petitioner does rely on one federal case, however:  *White v. Thaler*, 610 F.3d 890 (5th Cir. 2010).  There, a Texas state jury convicted the petitioner, Wendell White, of the aggravated murder of Latasha Vasquez and the aggravated assault of Tracey Johnson after running over each of them with a pickup truck.  *Id*. at 892.  On appeal, White alleged, among other things, that trial counsel was ineffective for failing to object to the introduction of evidence of Vasquez's pregnancy.  *Id*. at 894.  The Texas Court of Criminal Appeals (TCCA) and the federal district court rejected this claim.  *Id*. at 894–95. The Fifth Circuit disagreed with the state and federal district courts, concluding that trial counsel's failure to object to such evidence constituted deficient performance because the evidence had "no probative value," Texas state law did not support the admission of the evidence, and trial counsel indicated that no strategy gave rise to their decision.  *Id*. at 907–09.  The Fifth Circuit determined that White suffered prejudice as a result because "the evidence that White intended to kill Vasquez pales in comparison to the

evidence that White intended to run over Johnson." *Id*. at 912. The court further explained that the record belied the TCCA's characterization of the references to Vasquez's pregnancy as "brief," explaining:

> We do not necessarily agree with the TCCA's assessment that the testimony and argument with respect to the victim's pregnancy was "brief." Defense counsel brought up the victim's pregnancy twice during the direct examination of White and three times during closing argument. The prosecutor asked two questions regarding the fetus and referred to the unborn child twice during closing argument. In total, the jury was reminded nine times during the guilt-innocence phase that Vasquez's unborn child died as a result of White's actions. Further, the prosecutor's closing argument regarding the unborn child being killed as the victim was "dragged" and "crushed" by the truck was likely to appeal to the jury's emotions and encourage the jury to make its guilt-innocence decision on an emotional basis.

*Id*. at 911–12.

*White* does not entitle petitioner to habeas relief. As an initial matter, even if I were to conclude that the Kentucky Supreme Court's decision in this case was "contrary to" *White*, that case is not a Supreme Court precedent—thus, petitioner could still not establish that the Kentucky Supreme Court's decision was "contrary to [clearly established] federal law." *Bey*, 500 F.3d at 520; *see also* 28 U.S.C. § 2254(d)(1).

Regardless, *White* is distinguishable. Unlike petitioner, White raised a federal constitutional claim that is cognizable on habeas review—the ineffective assistance of counsel. Our review of petitioner's claim is far more circumscribed than was the Fifth Circuit's of White's claim. Because petitioner raises a due process claim, this court may only grant relief if the admission of the evidence of Warfield's pregnancy was "so prejudicial that it violated [petitioner's] right to a fundamentally fair trial." *Pudelski v. Wilson*, 576 F.3d 595, 613 (6th Cir. 2009). Petitioner's trial was not fundamentally unfair. Unlike in *White*, the trial court in the instant case limited the references to Warfield's pregnancy, which was mentioned twice during a trial that lasted several weeks, and no reference was made to any harm suffered by the embryo.

Further, prosecutors presented substantial evidence of petitioner's guilt, which included—unlike in *White*—substantial evidence of his intent to commit the crimes. Malone was stabbed nine times. The fatal wound was the one that punctured his heart. Warfield was

strangled to death. Petitioner testified that when he arrived at the apartment he saw Malone "laying face down by the back door in a pool of blood" and that he did not know Warfield was there. However, expert testimony established that blood found on Warfield's thigh matched petitioner's DNA. According to petitioner, a masked assailant armed with a knife was the real killer, and petitioner fought with him at the apartment, suffering wounds on his hands and arms as a result. Petitioner testified that he did not go to the police due to his crack cocaine use. But, petitioner testified, following what he allegedly witnessed at the apartment, he bought band-aids, went to his mother's house, visited friends, bought beer, and visited other friends to smoke crack. "Intent to kill can be inferred from the extent and character of a victim's injuries," and "because a person is presumed to intend the logical and probable consequences of his conduct, a person's state of mind may be inferred from actions preceding and following the charged offense." *Hudson v. Commonwealth*, 979 S.W.2d 106, 110 (Ky. 1998) (citation and quotation marks omitted). Here, the brutality of the injuries and Wheeler's conduct immediately after the crime, as well as his failure to truthfully answer police inquiries, constitute significant evidence of his guilt.

Additionally, petitioner notes that his case and one Kentucky Supreme Court Justice's dissent on the issue of Warfield's pregnancy in his direct appeal became a topic of discussion in the electoral race for the Kentucky Supreme Court years after the issuance of the Kentucky Supreme Court's decision. This argument, perhaps obviously, is unpersuasive. Putting aside the fact that what happened in an election three years after petitioner's direct appeal has no bearing on what happened at his trial—and thus, could not have been a source of prejudice at that trial— this argument has nothing whatsoever to do with federal law.

In short, petitioner has failed to persuade me that the admission of evidence related to Warfield's pregnancy rendered his trial fundamentally unfair. Accordingly, no habeas relief is appropriate on this claim.

IV.

Next, petitioner argues that the trial court improperly admitted evidence as to the availability in the future of prison furloughs. Specifically, petitioner argues that, through this evidence, the jury was led to believe that "unless [it] imposed a sentence of death, [petitioner]

might one day be released into the community on furloughs," which petitioner argues was "irrelevant speculation that unfairly tilted the evidence in favor of a death sentence in violation of [his] constitutional right to a reliable capital sentencing determination."

> This court may only review claims that have not been procedurally defaulted.
>
> A habeas petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (citation and internal quotation marks omitted).

This claim is procedurally defaulted. Petitioner acknowledges that he failed to raise this claim on direct appeal, raising it for the first time in his state post-conviction proceeding. Thus, petitioner "fail[ed] to comply with [Kentucky's] procedural rule[,]" *id.*, namely that a post-conviction proceeding is not the place for a "convicted defendant to retry issues which could and should have been raised in the original proceeding, nor those that were raised in the trial court and upon an appeal considered by [the Kentucky Supreme Court]." *Thacker v. Commonwealth*, 476 S.W.2d 838, 839 (Ky. 1972). Consistent with this rule, on his state post-conviction appeal, the Kentucky Supreme Court "enforce[d] the rule[,]" *Guilmette*, 624 F.3d at 290, when it declined to review the merits of this claim. *Wheeler*, 2008 WL 5051579, at *9 ("If Appellant wanted to challenge the [furlough] evidence presented at trial, he should have done so in his direct appeal, not by means of a [post-conviction collateral proceeding]."). This is an independent and adequate state ground for denying review. *See Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999). Nor has petitioner demonstrated cause and prejudice to excuse this default. Although petitioner asserted in the district court that his direct-appeal counsel's failure to raise this issue amounted to cause and prejudice to excuse the default, he does not do so in this court. Accordingly, petitioner has abandoned his argument that cause and prejudice exist to overcome the procedural bar. *See Post*, 621 F.3d at 427.

V.

Petitioner next raises another claim related to evidence of furloughs.  Specifically, he claims that his trial counsel was ineffective for introducing testimony that he had received furloughs during his previous incarceration.  Petitioner argues that this testimony "suggest[ed] to the jury, and open[ed] the door for the jury to conclude . . . [that] the defendant could receive a furlough during which he could commit another violent crime" and "opened the door for the prosecution to utilize the furlough evidence to prejudice the jury, to play up [petitioner's] violent criminal history and failure to learn a lesson in prison, and to let the jury know it was possible [petitioner] could receive a furlough if sentenced to less than death."

The general standards governing a claim of ineffective assistance of counsel are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To demonstrate ineffective assistance of counsel, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  *Wiggins*, 539 U.S. at 521 (citing *Strickland*, 466 U.S. at 687)).

> In the context of a death sentence, the question of prejudice turns on "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would conclude that the balance of aggravating and mitigating circumstances did not warrant death."

*Hill v. Mitchell,* 400 F.3d 308, 314 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 695).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).  I conclude that petitioner has not shown that his counsel's conduct with regard to the furlough testimony was contrary to, or an unreasonable application of, *Strickland*.

At the penalty phase, petitioner's counsel introduced a variety of evidence intended to establish that petitioner had been a model prisoner during previous incarcerations, including evidence of furloughs.  For example, petitioner's trial counsel introduced the testimony of Michael Cooper, an employee at the Luther Luckett Correctional Complex where petitioner had served a prior incarceration.  Cooper testified that petitioner worked for him as a janitor in the

Property Room and exhibited a "good work ethic" and required "very, very little supervision." Cooper testified he was not aware of any disciplinary action ever being taken against petitioner. According to Cooper, petitioner received two furloughs while incarcerated. Cooper added that he did not know whether prisons still offered furloughs, but did know that none had been granted "for several years" and noted that such a grant was "extremely rare."

Petitioner's counsel also introduced the testimony of Robin Rawlings, who had recently worked as a Classification and Treatment Officer with the Department of Corrections and as a Probation and Parole Officer with the Commonwealth's Department of Justice. Rawlings testified that, as an inmate, petitioner worked as a janitor in the administration building, which included the offices for the prison warden and the deputy warden. Rawlings indicated that she spoke with petitioner every day, and she was not aware of any complaints, conflicts, or problems from either the staff or other inmates regarding him. Rawlings also worked with petitioner within a small group setting to assist inmates with their chemical dependency issues. Prison life is "very regulated and dictated by rules[,]" according to Rawlings, and petitioner was a "model inmate."

Rawlings was also queried about furloughs. To that end, Rawlings testified that, based on the policy in place at the time she was employed at the prison, she was "positive" that petitioner would not be eligible for a furlough given his two murder convictions. On cross-examination, the prosecutor also asked Rawlings about furloughs:

> [PROSECUTOR]: Um, Ms. Rawlings, uh, as far as furloughs are concerned, there was a time when individuals who were convicted of murder were granted furloughs, is that correct?
>
> ROBIN RAWLINGS: Yes, sir, that's true.
>
> [PROSECUTOR]: Okay, and they changed the policy at some point, right?
>
> ROBIN RAWLINGS: Yes, they did.
>
> [PROSECUTOR]: Okay, and you can't, uh, tell this jury what the policy is going to be in the future, 20, 30 years? You don't know that, do you?
>
> ROBIN RAWLINGS: That's true, sir.
>
> [PROSECUTOR]: Okay, policies change?
>
> ROBIN RAWLINGS: Yes, they do.

The record indicates that, when introducing testimony about petitioner's prior furloughs, petitioner's trial counsel was attempting to obtain a sentence other than death for petitioner. For example, during closing arguments, petitioner's trial counsel stated:

> We're not saying that these people did not suffer or that their families do not continue to suffer. We are telling you that the death penalty is not your only option. If you find the mitigation, if you find any redeeming qualities, and there are some there, you should give him his life.

Testimony by Cooper and Rawlings showed that Wheeler worked well within the structured environment of prison during the time of his previous incarceration. Wheeler had already admitted to being a convicted felon during his guilt-phase testimony. At the penalty phase, the prosecution introduced evidence that petitioner pleaded guilty to ten counts of robbery on November 20, 1991, for which he was sentenced to twenty years of imprisonment, and that, later, on August 13, 1998, petitioner was convicted for illegal possession of a controlled substance (cocaine), for which he received a sentence of one year.

In the context of this record, petitioner's counsel argued that petitioner suffered from a drug addiction but could otherwise thrive within the structured environment of prison life:

> When you think of these offenses, I would think of someone who's been in trouble all their lives, who's never been responsible, who's never been stable, who could never hold a job, who could never find someone to love him or care about him. But that's not what we found here in the case of Roger Wheeler. We have found someone who has been, at one time, responsible and capable and stable and able to work and able to contribute, and I think he can still contribute in the penitentiary.

Based on this record, I conclude that petitioner is not entitled to relief on this claim. A petitioner has a constitutional right to present testimony during the penalty phase about his good behavior while incarcerated. *See Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). That is what petitioner's trial counsel did. The inclusion of the furlough testimony simply emphasized the benefit that petitioner derived from incarceration. It also showed the trust he had earned with prison officials. Moreover, our precedent buttresses my conclusion. In *Campbell v. Bradshaw*, 674 F.3d 578, 588 (6th Cir. 2012), this court concluded that trial counsel was not ineffective for introducing the petitioner's entire incarceration record during the penalty phase of trial because it was "part of a strategic effort to be candid with the jury about Campbell's past in an effort to

gain credibility and, ultimately, obtain a life sentence for Campbell." No prejudice resulted in that case because a mental health expert addressed the same information and the jury heard much of the negative information from other sources. *Id*. at 589. The same thing occurred here and thus the same result is warranted. Notwithstanding the furlough testimony, the jury was aware that petitioner had served only a fraction of his twenty-year sentence from his prior convictions.

VI.

Petitioner raises yet another ineffective assistance of counsel claim related to the furlough testimony. Specifically, petitioner argues that his counsel was constitutionally defective for failing to object when the prosecutor cross-examined Rawlings about the potential availability of future furloughs and when the prosecutor raised the furloughs issue in closing arguments. I disagree.

Initially, as for his claim regarding his counsel's failure to object at oral argument, petitioner has procedurally defaulted this claim. Petitioner did not raise this claim in state court. Under Kentucky's rules of criminal procedure, petitioner had three years "after the judgment [became] final" to raise this issue. *Roach v. Commonwealth*, 384 S.W.3d 131, 135 (Ky. 2012). That time has now passed. Thus, petitioner has failed to comply with a state procedural rule, and that rule is an independent and adequate state ground for denying review of this claim. *See Guilmette*, 624 F.3d at 290; *see also Lucas*, 179 F.3d at 418. Accordingly, petitioner has procedurally defaulted this claim. *See Lovins v. Parker*, 712 F.3d 283, 293 (6th Cir. 2013) ("[A] claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.").

Nor is habeas relief appropriate on petitioner's claim regarding his counsel's failure to object during Rawlings' cross-examination. This claim is not procedurally defaulted, as petitioner raised it in his state post-conviction relief proceedings. However, petitioner cannot show deficient performance or prejudice arising from his trial counsel's failure to object to the prosecution's cross-examination of Rawlings. As the Kentucky Supreme Court noted, the information contained within that testimony was accurate and not misleading. *Wheeler*, 2008 WL 5051579, at *10. Petitioner's concern about the speculative nature of Rawlings'

testimony is also unavailing.  In *California v. Ramos*, 463 U.S. 992, 1004 (1983), the Supreme Court rejected a similar argument—that a jury should not be instructed that a governor has the power to commute a sentence of life without parole as speculative and misleading—because the instruction in question "gives the jury accurate information of which both the defendant and his counsel are aware, and it does not preclude the defendant from offering any evidence or argument regarding the Governor's power to commute a life sentence."  The same is true here.

VII.

Petitioner also claims his counsel was ineffective for failing to:  (1) elicit from petitioner that his shoe size was larger than that of the bloody footprint found at the crime scene by the police; (2) elicit from petitioner that he possessed the shoes that he wore on the night of the murders; and (3) retain a shoe expert.  I address each part of this claim in turn, ultimately concluding that none entitles him to habeas relief.

Initially, I conclude that petitioner has procedurally defaulted his claim that his counsel should have elicited testimony from him about his shoe size.  Petitioner did not present this claim to the state courts and no state remedy now exists for doing so.  *See Lovins*, 712 F.3d at 293; *Guilmette*, 624 F.3d at 290; *Lucas*, 179 F.3d at 418.  And, petitioner does not attempt to show cause and prejudice to cure the default.

Nor is relief proper as to the other two parts of this claim.  During his guilt-phase direct testimony, petitioner recounted the day of his arrest, indicating that he was wearing "shower shoes."  The prosecutor then objected.  At sidebar, the prosecutor noted that petitioner's trial counsel had indicated that they had a pair of petitioner's tennis shoes in their possession; the prosecutor objected to the admission of the shoes because no chain of custody had been established and the shoes had been unaccounted for since the day of petitioner's arrest, more than three years prior to trial.  The trial court sustained the objection.  Following the conclusion of petitioner's testimony, petitioner's trial counsel offered petitioner's testimony concerning the tennis shoes by avowal.  Petitioner explained that he changed from flip-flops to tennis shoes when the police arrived at his mother's home to arrest him; the tennis shoes were located in his bedroom.  Petitioner testified that the tennis shoes had been in his possession as part of his personal property at the jail for all that time.

Petitioner argues that his trial counsel's failure to ask Wheeler whether he wore the tennis shoes on the night of the murders resulted in prejudice because "[t]he jury had to decide whether to believe [petitioner's] version of events surrounding the murders based solely on his testimony, which was inconsistent with what he told police in his pretrial statements," arguing that the admission of the shoes would have served as "concrete corroboration" of his testimony and "would have greatly enhanced his credibility." However, petitioner omits one critical point: without knowing Warfield's and Malone's shoe sizes to exclude the possibility that the bloody footprint belonged to one of them, he cannot demonstrate prejudice. And, as the magistrate judge and the district court noted, petitioner did not suffer prejudice given his lack of credibility because his "blood was found throughout the apartment including the very bedroom where [Warfield's] body was discovered. He repeatedly lied about his presence there to the police. He and his friend attempted to encourage perjury from another witness, Tracy Warrick, about the source of [petitioner's] knife wound on his left forearm."

As for petitioner's claim regarding his counsel's failure to call a shoe expert, I note that, in his state post-conviction proceeding, petitioner asserted that "[n]o expert testimony would be required for the jurors to compare the shoes with the shoe prints at the scene. A layperson could determine this fact." *Wheeler*, 2008 WL 5051579, at *6. The Kentucky Supreme Court considered this admission "tantamount to a concession that lack of an expert was not ineffective assistance." *Id*. I agree. Moreover, petitioner did not even make his own counsel aware of the alleged shoe size discrepancy until the middle of trial, when his trial counsel had no reasonable opportunity to retain such an expert on short notice. In light of these facts, I cannot conclude that the Kentucky Supreme Court unreasonably applied *Strickland* by determining that petitioner was not prejudiced by the lack of a shoe expert.

VIII.

Next, petitioner claims his trial counsel was ineffective for failing to call a witness, Earl Ricketts, Jr., to contradict the testimony of a prosecution witness, Denise Mumpfort. I disagree.

Mumpfort was an employee of the B-Line convenience store in October 1997, near the apartment building where the murders occurred. She testified that she worked from 10 p.m. on October 1 to 6 a.m. the following day. Mumpfort testified that she knew who petitioner was

"[b]y friends and coming in the store" on previous occasions.   Addressing the night of the murders, the following exchange occurred between the prosecutor and Mumpfort:

> DENISE MUMPFORT:   The night he came in the store, he came up to the counter, and I had asked him what had happened to him.
>
> [PROSECUTOR]:  Why did you ask him that?
>
> DENISE MUMPFORT:  Because he had blood on his head and had like finger cuts, looked like paper cuts on fingers.
>
> ALEX DATHORNE:  Okay, with blood on his head and finger - and cuts on his fingers?
>
> DENISE MUMPFORT:  Yes.
>
> [PROSECUTOR]:  Okay, and did he have any blood on his clothes?
>
> DENISE MUMPFORT:  Yes, on his jacket.
>
> [PROSECUTOR]:  And you asked him what had happened.  What did he say?
>
> DENISE MUMPFORT:  He said his little girl hit him in the head with something.

Later, the two discussed the amount of blood that Mumpfort had observed on petitioner:

> [PROSECUTOR]:  Okay.  Do you remember whether there was a lot of blood or a little bit of blood, or what was it, if you remember?
>
> DENISE MUMPFORT:  Hmm, it just looked like somebody just, you know, poured it on his head.
>
> [PROSECUTOR]:  So he had a lot of blood?
>
> DENISE MUMPFORT:  Sort of, on his head.  Majority of it was on his head.
>
> The police also interviewed Ricketts and prepared a report, which stated as follows:
>
> Upon meeting with Mr. Earl Ricketts Jr. at the above location, it should be noted that he is the security guard at this location.  I showed Mr. Ricketts a photo pack and he was unable to positively ID anyone.
>
> He did state that a black male subject had come into the B-Line sometime after 1 a.m. on the night of the murders.  He advised that this subject came in with blood on [the] right side of his neck and his hands.  The subject told Mr. Ricketts that he was wrestling with his daughter and needed a band aid.

In support of his argument that his counsel should have called Ricketts, petitioner provides an affidavit from Douglas Blair, an investigator employed by the Department of Public Advocacy, who indicated that he had conducted a telephone interview with Ricketts, who told

him that "Wheeler did not appear to have blood poured over his head" and that Wheeler "only had some blood on his collar and his hands."

Petitioner can demonstrate neither deficient performance nor prejudice as a result of his counsel's failure to call Ricketts. *See Otte v. Houk*, 654 F.3d 594, 601–02 (6th Cir. 2011) (citing *Strickland*, 466 U.S. at 687). As for *Strickland*'s deficient performance prong, petitioner argues that Ricketts' training as a security guard made him "uniquely credible" because he held a "position of trust" in comparison to Mumpfort. To this end, petitioner relies on *Workman v. Tate*, 957 F.2d 1339 (6th Cir. 1992). There, this court held that trial counsel was ineffective for failing to interview and present the testimony of the only two witnesses to an arrest who could have provided direct, contradictory evidence to that offered by the arresting police officers. *Id.* at 1345–46. Those are not the facts here. Ricketts' testimony would not have directly contradicted Mumpfort's in any material way. Both Ricketts' and Mumpfort's account of petitioner on the night of the murder involved the presence of blood on petitioner's person; the only disagreement between their accounts is the amount. The presence of blood, rather than the quantity of it, is the more important detail given petitioner's testimony that he fought the alleged assailant who was armed with a knife. Moreover, it is not a certainty that simply because Ricketts held a purported "position of trust" that the jury would have believed him and not Mumpfort. Thus, petitioner has failed to show that counsel was deficient for not calling Ricketts. As for *Strickland*'s prejudice prong, petitioner cannot demonstrate prejudice because—as discussed—there was substantial evidence of his guilt in any event. Accordingly, petitioner has failed to establish that his trial counsel's failure to call Ricketts resulted in a decision contrary to, or an unreasonable application of, *Strickland*.

IX.

Petitioner also challenges the penalty-phase jury instructions, alleging that they violated *Mills v. Maryland*, 486 U.S. 367 (1988), by improperly instructing jurors that they were required to be unanimous regarding the presence of mitigating factors. I disagree.

"The Constitution forbids imposition of the death penalty if the sentencing judge or jury is 'precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a

sentence less than death.'" *Henness v. Bagley*, 644 F.3d 308, 328 (6th Cir. 2011) (quoting *Smith v. Spisak*, 130 S. Ct. 676, 681–82 (2010)). "A challenge to a jury instruction is not to be viewed in 'artificial isolation,' but rather must be considered within the context of the overall instructions and trial record as a whole." *Hanna v. Ishee*, 694 F.3d 596, 620–21 (6th Cir. 2012) (citing *Estelle*, 502 U.S. at 72. "To warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. The burden is even greater than that to demonstrate plain error on appeal.'" *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001) (quoting *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000)).

Petitioner's claim lacks merit. Essentially, petitioner's argument is that because the jurors were instructed that their verdict had to be unanimous, but the trial court was silent in instructing them about unanimity as applied to mitigating factors, the jurors must have inferred that their mitigating-factor determination must also be unanimous. However, "[i]n this Circuit, failing to expressly state that mitigating factors need not be unanimously found does not improperly imply that mitigating factors must be unanimously found." *Williams v. Anderson*, 460 F.3d 789, 808 n.5 (6th Cir. 2006). Here, the trial court used the word "unanimous" only once, to explain that the verdict must be so: "The verdict of the jury must be in writing, must be unanimous, and must be signed by one of you as Foreperson." The verdict form required only that the jury find an aggravating circumstance to recommend the death sentence. Requiring a unanimous verdict as to the sentence is not unconstitutional. *See Moore v. Mitchell*, 708 F.3d 760, 794 (6th Cir.), *cert. denied*, 134 S. Ct. 693 (2013). Unlike in *Mills*, the jury instructions here did not, either explicitly or implicitly, require a unanimous finding of mitigating circumstances. Accordingly, the trial court's decision was not contrary to, or an unreasonable application of, *Mills*.

## X.

Petitioner next claims that several statements by the prosecutor amounted to misconduct; he alleges that these statements denied him a fundamentally fair trial in violation of his constitutional due process rights. I disagree.

A petitioner faces a high bar when bringing claims of prosecutorial misconduct. "For the prosecutor's misconduct to violate the defendant's due process rights, it 'is not enough that the prosecutor's remarks were undesirable or even universally condemned'; instead those comments must 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir. 2008) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Indeed, "[t]he prosecution . . . has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008)). I conclude that this latitude was properly exercised here. Accordingly, petitioner has not established that the prosecutor's statements resulted in a denial of due process that was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1); *Beuke*, 537 F.3d at 646.

Petitioner's first claim of prosecutorial misconduct involves the prosecutor's reference, during closing arguments, to the defense theory of the case as a "trick." The prosecutor stated: "So [defense counsel] gets up and said, 'Well, the shoeprint, that's the most telling of all.' Forget about all that DNA, forget about all the lies. It's called the defense trick. Look away, look away, look away. Don't look at the facts." Defense counsel objected, but the trial court overruled the objection because the prosecutor was merely "commenting [that] this is [petitioner's] theory of the case." I agree with the trial court—petitioner's counsel did rely on alleged inconsistencies in the shoeprint evidence. For example, petitioner's counsel argued that, because two shoeprints supposedly did not match, "[t]here were obviously two other people in that home" when the murders occurred. Similarly, petitioner's counsel asserted: "There had to be more than one person. The shoeprint evidence tells you that. . . . Now if these shoeprints would have fit those of [petitioner's] you would have heard that evidence. Those aren't [petitioner's] shoeprints." Thus, it is clear that the prosecutor's argument was in response to petitioner's counsel's argument and was not improper. In any case, petitioner's claim in this regard does not show that he was denied due process. *Beuke*, 537 F.3d at 646.

Petitioner also claims that the prosecutor's closing argument was constitutionally improper because the prosecutor "fault[ed petitioner] for not presenting crucial evidence and

implying the evidence was inculpatory even though the evidence was not presented solely because the prosecutor convinced the court to exclude it." Specifically, petitioner refers to the following portion of the prosecutor's closing argument.

> Shoeprint evidence: Ladies and gentlemen of the jury, this is why you find Roger Wheeler not guilty, because they found a shoeprint in this house. Hardwood floors, you got a shoeprint. . . . But you know what? We need a shoe to compare it to. We don't have that. If you remember, he says, "I had gray Nike Airs or gray Nike tennis shoes, denim pants, and a black or dark sweatshirt on." He knows where his clothes are at. Mr. Cooperative never brought them in.

Petitioner's counsel objected, arguing that the prosecutor's comments shifted the burden to petitioner to show he was innocent. The trial court ordered the prosecutor to move on, but explained that "it's fair for [the prosecutor] to comment on the fact that [defense counsel has] focused greatly on the shoeprint" and noted that petitioner's counsel had already described petitioner as cooperative. As noted, petitioner's counsel did mention shoeprint evidence, thus opening the door for the prosecution to discuss that topic. Although petitioner's counsel did not specifically use the word "cooperative" to describe petitioner, petitioner was described as such in other terms. Petitioner's trial counsel, during closing argument, stated: "A guilty person would not have offered his own biological samples. [Petitioner] knew that he did not kill those people. [Petitioner] knew there was evidence of someone else, because he knew that someone else was there." The prosecutor's comments were not improper because they were made in response to petitioner's counsel's argument.

Next, petitioner claims that the prosecutor's argument was constitutionally improper because it "suggest[ed] the defense was responsible for a crucial witness[, Shannon Calloway,] . . . not testifying, even though the prosecutor knew that witness had been killed before trial in an unrelated incident." During closing argument, the prosecutor argued:

> But then you start hearing about this Shannon Calloway fellow. Now what about Shannon Calloway? Let me ask you this, ladies and gentlemen of the jury. Aside from the interview that Detective Sherrard, uh, took from Shannon Calloway the day the bodies were discovered, when is the next time in this case you hear Shannon Calloway's name mentioned by this Defendant to any Detective in any statement? You don't hear about it until February of the year 2001. And you want to know what? It's kind of difficult in the middle of trial to stand up and run

out and find people that the Defense wants us to get up and start pointing fingers at.

The record demonstrates, however, that petitioner's trial counsel referred to Calloway multiple times before the prosecutor did. Indeed, petitioner's trial counsel suggested that Calloway may have been the real murderer:

> There's Shannon Calloway there at the house with these two deceased individuals, and they [the police] don't even question or check his story out to see if he did, in fact, go over there. You, you heard Tiffany Malone say she's the one that called the police. We haven't heard any evidence that anyone else called the police. I submit that Shannon Calloway missed something the night before when he was at the apartment, and he went back there to finish what he missed.
>
> * * *
>
> Maybe they should have checked Shannon Calloway's shoe size. Maybe they should have compared Shannon Calloway's shoes to what they've got here. I just don't see how, on October 3, that group of individuals that involved Shannon Calloway . . . and some other people, how they would have known that Roger Wheeler had a stab mark on him unless they had done it, or one of them had done it.

Thus, it is clear from the record that the prosecutor's comments were made in response to petitioner's trial counsel's intimations that Calloway was the real murderer; accordingly, the prosecutor's comments were not improper.

Finally petitioner claims that the prosecutor made constitutionally impermissible statements when referring to petitioner's evidence of his struggles with substance abuse as "excuses" and when the prosecutor allegedly offered his personal opinion about the case. However, petitioner did not object to either of these statements at trial, as he was required to do to preserve the issue for appeal pursuant to Kentucky Rule of Criminal Procedure 9.22. Accordingly, these claims are procedurally defaulted, and petitioner does not allege cause or prejudice to cure the default. *See West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87–88 (1977)).

For these reasons, petitioner is not entitled to habeas relief on his claims of prosecutorial misconduct.

XI.

Petitioner also claims that Kentucky's proportionality review violates the Eighth Amendment and denied him due process. Specifically, petitioner argues that Kentucky's proportionality review is unconstitutional because it incorporates cases in which the death sentence was not imposed and thus results in an arbitrary application of death sentences. I disagree. As this court previously explained in *Bowling*:

> The Supreme Court has held that the Constitution does require proportionality review, but that it only requires proportionality between the punishment and the crime, not between the punishment in this case and that exacted in other cases. *See Pulley v. Harris,* 465 U.S. 37, 50 (1984). Although "[t]here is no federal constitutional requirement that a state appellate court conduct a comparative proportionality review," *McQueen v. Scroggy,* 99 F.3d 1302, 1333–34 (6th Cir. 1996), *cert. denied,* 521 U.S. 1130 (1997), Kentucky law does require the Kentucky Supreme Court to engage in comparative proportionality review. *See* Ky. Rev. Code Ann. § 532.075(3)(c). Although claimed violations of state law are generally not cognizable on habeas, the Supreme Court has left room for the argument that a state-law error could, potentially, "be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment." *Harris,* 465 U.S. at 41.

344 F.3d at 521. The *Bowling* court expressed skepticism over whether § 532.075(3)(c) created a due process interest, noting that "the statute only explains what the Kentucky Supreme Court needs to consider—similar cases, the crime, and the defendant—it does not tell that court how to make this decision. This suggests . . . that no due-process right exists" pursuant to § 532.075(3)(c). *Id.* at 521–22.

Petitioner attempts to distinguish this case from *Bowling*, arguing that it "considered only a due process argument and merely noted that proportionality review is not required in light of *Harris*" but did not address what petitioner calls "threshold" statutes. According to petitioner, "*Gregg* [*v. Georgia,* 428 U.S. 153 (1976),] and [*Zant v.*] *Stephens*, [462 U.S. 862 (1983),] require jurisdictions with 'threshold' statutes to consider in proportionality review cases where the death penalty was not imposed." Petitioner defines "threshold statutes" as akin to "Georgia's and Kentucky's statutes that permit juries to impose death as long as an aggravator is found and mitigation considered." The Supreme Court in *Harris*, however, saw things differently:

While emphasizing the importance of mandatory appellate review under the Georgia statute, [*Stephens*], 103 S. Ct., at 2742, we did not hold that without comparative proportionality review the statute would be unconstitutional. To the contrary, we relied on the jury's finding of aggravating circumstances, not the State Supreme Court's finding of proportionality, as rationalizing the sentence. Thus, the emphasis was on the constitutionally necessary narrowing function of statutory aggravating circumstances. Proportionality review was considered to be an additional safeguard against arbitrarily imposed death sentences, but we certainly did not hold that comparative review was constitutionally required.

There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it. Indeed, to so hold would effectively overrule *Jurek* [*v. Texas*, 428 U.S. 262 (1976),] and would substantially depart from the sense of *Gregg* and *Proffitt* [*v. Florida*, 428 U.S. 242 (1976)]. We are not persuaded that the Eighth Amendment requires us to take that course.

465 U.S. at 50–51. Because petitioner offers no Supreme Court precedent supporting his notion that the Kentucky Supreme Court should have compared his case to cases in which the death penalty was not imposed, I conclude he is not entitled to relief on this claim.

XII.

Next, petitioner argues that his trial counsel was constitutionally ineffective for failing to explain the presence of petitioner's blood on Warfield's thigh and for failing to investigate the police's collection of this blood evidence. I disagree.

As an initial matter, petitioner cites neither any authority nor any portion of the record in support of his arguments regarding this claim. And, his argument is perfunctory in any event. Accordingly, petitioner has abandoned this claim on appeal. *See United States v. Villareal*, 491 F.3d 605, 611 (6th Cir. 2007) (citing *United States v. Johnson*, 430 F.3d 383, 397 (6th Cir. 2005)); *Gen. Star Nat'l Ins. Co.*, 289 F.3d at 441.

Moreover, even assuming that petitioner had not abandoned this claim, it is meritless. Again, in order to establish constitutionally ineffective assistance of counsel, a petitioner must demonstrate: (1) deficient performance by counsel—that is, that counsel's performance was objectively unreasonable under prevailing professional norms; and (2) prejudice to the defense as a result of that deficient performance. *See Strickland*, 466 U.S. at 687–88. Professional norms, for purposes of the *Strickland*'s deficiency prong, are "judged by reference to the time of

representation, and cannot be based on hindsight," and "[t]he burden lies with the petitioner to 'identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.'" *Storey v. Vasbinder*, 657 F.3d 372, 388 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 689, 690). As for the prejudice requirement, a petitioner can "show prejudice by establishing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (quoting *Strickland*, 466 U.S. at 694). Along these lines, this court has previously noted that "[w]hen analyzing a *Strickland* claim under § 2254(d), our review is doubly deferential. The key question is whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Campbell*, 674 F.3d at 587 (internal citations and quotation marks omitted).

Petitioner suggests that "the drop of blood on Warfield's thigh is consistent with [petitioner's] blood having 'dropped' from the killer's knife—the same one used to stab Malone and [petitioner]—onto Warfield's thigh." As in the state courts, however, petitioner offers no support for this argument. This argument is entirely speculative. Petitioner points to no facts at trial that would support his theory that his blood was transferred by the real killer's knife and dropped on Warfield's thigh. And, even if that lack of evidence was the result of petitioner's trial counsel's failure to investigate, in light of the other overwhelming evidence of petitioner's guilt, I would still conclude that there was some "reasonable argument" that petitioner's trial counsel's strategy satisfied *Strickland*. Accordingly, even if he had not abandoned this claim, petitioner would not be entitled to habeas relief.

## XIII.

Finally, petitioner argues that the trial court's failure to instruct the jury on voluntary intoxication and extreme emotional disturbance denied him a fundamentally fair trial and thus was contrary to, or an unreasonable application of, the Supreme Court's holding in *Beck v. Alabama*, 447 U.S. 625 (1980). I disagree.

"In capital cases, *Beck v. Alabama* requires that the jury be instructed on a noncapital lesser-included offense if, and only if, 'the evidence would permit a jury rationally to find [the

defendant] guilty of the lesser offense and acquit him of the greater.'" *Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010) (quoting *Beck*, 447 U.S. at 635). In *Hopper v. Evans,* 456 U.S. 605, 611 (1982), the Court explained that "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." Here, the evidence does not warrant such an instruction. In support of this claim, petitioner offers only that "evidence throughout trial demonstrates [petitioner's] entitlement to an instruction on voluntary intoxication and extreme emotional disturbance (his actual drug abuse on the day of the offense, the nature of the crime, and his disheveled appearance following the crime)." However, "Kentucky law requires a 'triggering event,' that is responsible for causing the emotional disturbance." *Baze v. Parker*, 371 F.3d 310, 325 (6th Cir. 2004) (quoting *Stanford v. Commonwealth*, 793 S.W.2d 112, 115 (Ky. 1990)). "A triggering event is dramatic, creating a *temporary* emotional disturbance that overwhelms the defendant's judgment." *Id.* (citing *Spears v. Commonwealth*, 30 S.W.3d 152, 153, 155 (Ky. 2000)). Petitioner has made no showing of a triggering event justifying an emotional disturbance instruction. The same is true concerning the voluntary intoxication instruction. "[A]n accused is entitled to have the defense of intoxication submitted in instructions to the jury if the evidence is sufficient to indicate that the degree of intoxication was at a level which prevented the forming of the intent necessary under the statute." *Foster v. Commonwealth*, 827 S.W.2d 670, 677 (Ky. 1991) (citing *Parido v. Commonwealth*, 547 S.W.2d 125 (Ky. 1977)). No such evidence was presented here. Presumably referring to the use of crack cocaine, petitioner only testified that, before the crime, he "was over to Donnie's, we, uh, we was using some then, and that's when we decided to get some – you know, try to obtain some more." This, without more, is insufficient to warrant relief.

XIV.

For these reasons, I conclude that petitioner is not entitled to relief on any of his claims and would affirm the district court in all respects. Accordingly, I respectfully dissent.